# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| VELOXIS PHARMACEUTICALS, INC.<br>499 Thornall Street, 3rd Floor<br>Edison, New Jersey 08837 | ) ) ) ) | |
| Plaintiff, | ) ) | |
| -v.- | ) ) | |
| UNITED STATES FOOD AND DRUG<br>ADMINISTRATION<br>10903 New Hampshire Avenue<br>Silver Spring, MD 20993, | ) ) ) ) ) | |
| DR. MARGARET HAMBURG, in her official capacity<br>as COMMISSIONER OF FOOD AND DRUGS,<br>UNITED STATES FOOD AND DRUG<br>ADMINISTRATION<br>10903 New Hampshire Avenue<br>Silver Spring, MD 20993, | ) ) ) ) ) ) ) | Civil Action No.  14-cv-2126 |
| SYLVIA MATHEWS BURWELL, in her official<br>capacity as SECRETARY, UNITED STATES<br>DEPARTMENT OF HEALTH AND HUMAN<br>SERVICES<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201, | ) ) ) ) ) ) ) | |
| and | ) ) | |
| UNITED STATES DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES<br>200 Independence Avenue, S.W.<br>Washington, D.C. 20201 | ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Veloxis Pharmaceuticals, Inc. ("Veloxis") brings this action seeking declaratory and injunctive relief against defendants United States Food and Drug Administration ("FDA" or the "Agency"), Dr. Margaret Hamburg, in her official capacity as Commissioner of the FDA, United States Department of Health and Human Services ("HHS"), and Sylvia Mathews Burwell, in her official capacity as Secretary of HHS (collectively, "Defendants" or "FDA").  In support thereof, Plaintiff states as follows:

## PRELIMINARY STATEMENT

1.      This is an action for declaratory and injunctive relief arising out of Defendants' unlawful, arbitrary and capricious decision to delay final marketing approval of an anti-rejection medication developed by Veloxis for kidney transplant recipients.

2.      The medication, known as Envarsus® XR, is an extended-release tablet containing the active ingredient tacrolimus.  Envarsus XR is different in several respects from currently marketed oral tacrolimus products, and these differences may be clinically significant for certain kidney transplant recipients.

3.      Envarsus XR was subject to an extensive clinical development program spanning almost 10 years and involving 25 clinical trials at a cost to Veloxis of more than $200 million. The Envarsus XR clinical development program was designed in coordination with, and through extensive input from, FDA.

4.      It is undisputed that the Envarsus XR New Drug Application ("NDA") meets all FDA requirements for demonstrating safety and efficacy for its intended use.

5.      Envarsus XR has been proven to be safe and effective.  Consistent with that fact, FDA took final agency action on the Envarsus NDA by issuing a "Tentative Approval" letter to Veloxis on October 30, 2014.  This letter explained that, although FDA had found Envarsus XR

to be eligible for approval, it was delaying final marketing approval of Envarsus XR until July 2016, based on the erroneous conclusion that the period of statutory exclusivity granted to a different extended-release tacrolimus product, Astagraf XL®, blocks Envarsus XR from currently being sold.  Between October 30, 2014 and December 15, 2014, Veloxis attempted to convince FDA that its action in denying immediate approval for Envarsus XR is legally incorrect, but FDA has not altered its erroneous decision.

6.     The plain language of the Federal Food, Drug, and Cosmetic Act ("FDCA") and its implementing regulations, as well as 20-plus years of FDA policy and practice, demonstrate that FDA's conclusion is legally erroneous, and that there are no applicable blocking exclusivities that prevent immediate, final approval of Envarsus XR.

7.     FDA has ignored the plain statutory language, structure, and purpose of the FDCA in declining to issue the final approval for Envarsus XR until July 2016.  Astagraf XL was not entitled to any grant of exclusivity because the relevant portion of the statute prohibits granting exclusivity to drug products that contain antibiotics approved prior to 1997 unless the application for approval was submitted after October 2008.  Tacrolimus is such an antibiotic and Astellas Pharma US, Inc. ("Astellas"), the manufacturer of Astagraf XL, originally filed its NDA in 2005.  As a result, Astagraf XL was not entitled to exclusivity as a matter of law and FDA's grant of exclusivity to Astagraf XL exceeded its statutory authority.  FDA's decision to prevent Envarsus XR from being marketed until July 2016, therefore, was arbitrary and capricious and otherwise unlawful.

8.     Even if Astagraf XL was entitled to exclusivity, as a matter of law, that exclusivity does not block approval of Envarsus XR.  Under the language and structure of the FDCA, regulatory exclusivity granted to one drug product will only block approval of

subsequent drug products if the subsequent applicants *rely upon* the clinical studies supporting approval of the first drug product (or FDA's findings of safety and effectiveness for the first drug product).  Although Veloxis did not rely upon *any study* conducted in connection with the approval of Astagraf XL, or upon FDA's findings of safety and effectiveness for Astagraf XL, FDA nevertheless has applied Astagraf XL's exclusivity to block Envarsus XR in direct contravention of the statute's mandate.

9.      FDA also has applied the exclusivity granted to Astagraf XL in an arbitrary and capricious manner, erroneously concluding that Envarsus XR and Astagraf XL share the same "conditions of approval."  Despite repeated requests, FDA has never informed Veloxis of the "conditions of approval" that allegedly are shared among the two drugs.  According to FDA's "Orange Book," which is intended to provide notice to competitors, like Veloxis, of the scope of exclusivity awards that may block approval of their competing products, Astagraf XL's exclusivity is based upon its "new dosage form," which is an extended-release *capsule*. Envarsus XR has a different dosage form, an extended-release *tablet*.  In ruling that Envarsus XR and Astagraf XL share the same "conditions of approval," FDA has ignored the significant clinical differences between the two drugs and the material differences in the package inserts and has abandoned more than 20 years of its own precedent.

10.     To prevent the potentially irreparable harm to patients who could benefit from immediate treatment with Envarsus XR, as well as the attendant significant economic harm to Veloxis, Veloxis seeks immediate declaratory and injunctive relief from this Court.

## **JURISDICTION AND VENUE**

11.     This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*. and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1346, and 1361.

12.     The decision challenged in this case is a final agency action of FDA.

13.     This Court may grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

14.     There exists an actual and justiciable controversy between Veloxis and Defendants requiring resolution by this Court.

15.     Venue in this District is proper under 28 U.S.C. § 1391(b) and (e) and 5 U.S.C. § 703.

### Parties

16.     Plaintiff Veloxis is a research-based, specialty pharmaceutical company located in Edison, New Jersey.  Its corporate parent, Veloxis Pharmaceuticals A/S, is headquartered in Denmark.  On December 28, 2013, Veloxis submitted an NDA for Envarsus XR, an extended-release tacrolimus tablet for prophylaxis of organ rejection in kidney transplant patients.

17.     Defendant HHS is a cabinet-level department of the United States headquartered in Washington, D.C.

18.     Defendant FDA is an agency of the United States and a division of Defendant HHS.  It is headquartered in Silver Spring, Maryland, and its governmental activities occur in the District of Columbia and nationwide.  FDA administers the FDCA.

19.     Defendant Sylvia M. Burwell is the Secretary of HHS and ultimately is responsible for implementation and execution of the FDCA and associated regulations.  Defendant Burwell, through the FDA Commissioner, regulates the approval of new drugs under Section 505 of the FDCA, 21 U.S.C. § 355.  Defendant Burwell is sued in her official capacity only.  As Secretary of HHS, Defendant Burwell is responsible for all actions taken by the departments she heads.  Her governmental activities occur in the District of Columbia and nationwide.

20.     Defendant Margaret A. Hamburg is the FDA Commissioner and is responsible for the implementation and execution of the FDCA and associated regulations.  Defendant Hamburg has been delegated authority to enforce the requirements of the FDCA, 21 U.S.C. § 393(d), including the approval of new drugs under Section 505 of the FDCA, 21 U.S.C. § 355. Defendant Hamburg is sued in her official capacity only.  Her governmental activities occur in the District of Columbia and nationwide.

## STATEMENT OF CLAIM

### Use of Immunosuppressant Therapies to Prevent Rejection of Transplanted Kidneys

21.     In 2013, there were 16,895 kidney transplants performed in the United States. The average life expectancy of a transplanted kidney is approximately 10 years.

22.     Much of the cost of kidney transplant surgery in the United States, as well as the associated medical care, is borne by the federally funded Medicare program.  Individuals with End-Stage Renal Disease ("ESRD"), defined as permanent kidney failure requiring dialysis or a kidney transplant, are eligible to receive Medicare benefits regardless of their age, provided certain conditions are met.  In fiscal year 2011, the Medicare program spent $34.3 billion for ESRD.    Medicare's expenditures for ESRD patients receiving a kidney transplant are considerably lower than those treated with kidney dialysis.  As a result, there is a compelling public interest in ensuring access to the best-available treatment for kidney transplant patients.

23.     When a patient with ESRD undergoes a kidney transplant, the patient's immune system attempts to reject the transplanted organ to protect itself from foreign tissue. Immunosuppressive drugs are used to decrease the body's immune response and thus prevent the body from rejecting the transplanted organ.  Rejection of a transplanted organ can be fatal to both the life-saving organ and the transplant recipient.

24.     Tacrolimus is an immunosuppressive drug that can be used after an organ transplant to reduce the activity of the body's immune system and lower the risk of organ rejection.  Tacrolimus was first approved by FDA for this use in 1994 and marketed under the brand name Prograf®.  Prograf is not subject to any statutory or patent exclusivities.

25.     There have been very few new immunosuppressive therapies introduced to the market in recent years.  Many of the currently marketed immunosuppressive drugs include serious side-effects for patients, including nephrotoxicity (drug toxicity affecting kidney cells and function), infectious complications, delayed wound healing, and bone marrow suppression.

26.     Improved immunosuppressive therapies can increase the survival of transplanted organs, thereby reducing the number of patients requiring successive transplants and, ultimately, enabling more patients to receive organ transplants.  In particular, new therapies that are less toxic and that reduce the pill burden on patients can result in improved adherence to the medication regimen, which is crucial to maintaining the function of a transplanted kidney.

27.     Tacrolimus is a "narrow therapeutic index" drug, meaning that the active ingredient must be maintained in the patient's blood within a narrow range throughout the lifetime of the transplanted organ.  If the blood levels of the active ingredient fall below a minimum threshold, the drug is ineffective and the patient's immune system may reject the transplanted organ.  If blood levels of the active ingredient are above the prescribed range, there is an increased risk of serious side effects such as kidney damage, tremors, or hypertension.  For narrow therapeutic index drugs like tacrolimus, the "sweet spot" between these upper and lower limits is small.  As a result, the concentration and dosing of tacrolimus must be carefully managed and individually tailored for each transplant patient.

28.     To arrive at the appropriate dosing regimen, transplant patients typically are required to undergo regular monitoring for months after receiving a new organ to evaluate the blood level concentrations of tacrolimus.  This adjustment regimen requires repeated visits to the physician's office or a hospital because patients metabolize drugs differently.  The potential for blood level concentrations outside the therapeutic range and the need for repeated monitoring and dosing adjustments may significantly impact a transplant recipient's quality of life.  As a result, physicians proactively seek treatment options that provide stability within the therapeutic range and that maintain blood levels within the therapeutic range for longer periods of time.

29.     New tacrolimus therapies may have particular significance for African-American patients.  Studies have shown that African-Americans are at an increased risk of acute kidney rejection when compared to other patient groups.  Data also shows that African-Americans are less likely to receive kidney transplants, and when they do, the average life span of the kidney is far less than for non-African-American patients.  This discrepancy has been attributed to the fact that 85% of African-Americans are rapid metabolizers of tacrolimus.

30.     Rapid metabolization makes it difficult to maintain appropriate concentrations of tacrolimus in a patient's blood.  On the one hand, patients who rapidly metabolize tacrolimus are perpetually in danger of having the tacrolimus levels in their blood fall below desired levels (because it passes through their system so quickly), risking kidney rejection or failure.  On the other hand, in order to maintain the required minimum level of tacrolimus and prevent kidney rejection, physicians may treat rapid metabolizers with more frequent or larger doses of tacrolimus.  The use of larger doses can result in high peak levels of tacrolimus in the patient's blood, which can increase the risk of serious negative side effects due to the drug's toxicity.  The

alternative of more frequent doses is an added burden to the patient and increases the risk of non-compliance with consequent risk of transplant rejection.

31.     Therapies that increase the absorption of tacrolimus and maintain a steady-state blood level of the active ingredient may lead to improved clinical outcomes, especially for rapid metabolizers.

## FDA New Drug Approval Process

32.     The FDCA requires a new prescription drug to be approved by FDA before it may be commercially distributed in interstate commerce.  Section 505 of the FDCA outlines three pathways for obtaining approval of a new drug.

33.     Under Section 505(b)(1) of the FDCA, a sponsor may seek approval for a drug by providing FDA with full reports of investigations of safety and effectiveness.  21 U.S.C. § 355(b)(1). This type of application requires the applicant to conduct clinical and non-clinical (animal) studies to demonstrate the safety and effectiveness of the proposed new drug for its intended use.

34.     Alternatively, under Section 505(b)(2) of the FDCA, an application may be submitted for a change to or modification of a "listed drug" for which the FDA already has made a finding of safety and effectiveness.  21 U.S.C. § 355(b)(2).  A Section 505(b)(2) application contains full reports of clinical studies demonstrating safety and effectiveness of the drug, but differs from a 505(b)(1) application because it relies, in part, on safety and/or efficacy data from a previously approved drug.  Section 505(b)(2) applications are permitted to rely on prior studies of approved drugs, or on FDA's findings of safety and effectiveness based upon those prior studies, because, as FDA recognizes, it is wasteful and unnecessary to carry out studies to demonstrate what is already known about a drug.  Importantly, however, a 505(b)(2) application

must identify the "listed drug" on which the applicant relies in seeking approval of its proposed drug product.  21 C.F.R. § 314.54(a)(1)(iii).

35.     Under Section 505(j) of the FDCA, an "Abbreviated New Drug Application" ("ANDA") may be submitted for approval of a generic version of a drug that already has received FDA approval.  21 U.S.C. § 355(j).  A drug submitted for approval under Section 505(j) typically must have the same active ingredient, dosage form and strength, route of administration, labeling, quality, performance characteristics, and intended use as a previously approved drug.  21 U.S.C. § 355(j).  Drugs that contain the same active ingredient as a previously approved drug, but have different dosing regimens or pharmacokinetic profiles from the approved drug, may not be approved under Section 505(j).

36.     Under the Prescription Drug User Fee Act ("PDUFA"), Pub. L. 102-571 (Oct. 29, 1992), FDA is committed to meeting certain time goals for completing its review of NDAs.  For example, FDA committed to complete its review of the Envarsus XR NDA within ten months from the date of submission, and the applicable PDUFA date was October 30, 2014.

### New Clinical Study Exclusivity

37.     Pursuant to the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417 (Sept. 24, 1984) (also known as the "Hatch-Waxman Amendments"), the FDCA awards periods of exclusivity to approved drugs in certain circumstances.  Specifically, the FDCA provides "new clinical study exclusivity" to drugs whose applications contain "reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the applicant."  21 U.S.C. § 355(c)(3)(E)(iii).

38.     This period of new clinical study exclusivity extends for three years from the date of the first drug's approval and prohibits FDA from approving a 505(b)(2) application "for the conditions of approval" of the first drug if the safety and effectiveness studies relied upon by the

505(b)(2) applicant "were not conducted by or for [the 505(b)(2) applicant] and if [that applicant] has not obtained a right of reference or use from the person by or for whom the investigations were conducted." *Id.*

39.     The Hatch-Waxman Amendments incentivize innovative clinical studies through the provision of exclusivity that precludes final approval of applications that rely on such clinical studies to establish safety and efficacy for their drugs.  The Hatch-Waxman Amendments affect only those applications that rely on the innovator's data.  Long-standing FDA policy and precedent demonstrate that exclusivity is not intended to interfere with legitimate competition in the marketplace among innovative companies that develop supporting data independently.

## Pre-Repeal Antibiotics

40.     The Hatch-Waxman Amendments provide three- and five-year exclusivity for qualifying applications submitted under Section 505 of the FDCA.  Antibiotics historically were not eligible for exclusivity under the Hatch-Waxman Amendments because they were approved under Section 507 of the FDCA rather than Section 505.

41.     In 1997, through the Food and Drug Administration Modernization Act ("FDAMA"), Pub. L. No. 105-115 (Nov. 21, 1997), Congress repealed Section 507 of the FDCA and directed FDA henceforth to approve all antibiotics under Section 505.   FDAMA, § 125(d)(1).  In so doing, Congress explicitly provided that certain Hatch-Waxman incentives, including three-year exclusivity, would not apply to any application for a drug product that contained a so-called "pre-repeal antibiotic" (an antibiotic drug that was the subject of an approved or pending application under Section 507 prior to November 21, 1997).   *Id.* Tacrolimus is a pre-repeal antibiotic.

42.     In 2008, as part of the QI Program Supplemental Funding Act ("QI Act"), Pub. L. No. 110-379 (Oct. 8, 2008), Congress amended the FDCA to spur research into new and

innovative antibiotic therapies, particularly given the growing concern regarding antibiotic resistance.

43.     In Section 505(v) of the FDCA, which was added by the QI Act, Congress provided that NDAs could be granted three- or five-year exclusivity even if they contained a pre-repeal antibiotic, provided they sought approval for a "condition of use" not approved prior to October 8, 2008.  21 U.S.C. § 355(v)(1)(A); *id.* § 355(v)(3)(B).  However, Congress explicitly limited these exclusivity rights to newly developed products and thus did not authorize exclusivity for any drug product containing a pre-repeal antibiotic unless it was the subject of an NDA submitted after October 8, 2008.  *Id.* § 355(v)(1)(B)(i).  In other words, exclusivity is not available to pre-repeal antibiotics subject to NDAs that had been approved or were pending prior to October 8, 2008.

### History of the Envarsus XR 505(b)(2) New Drug Application

44.     The Envarsus XR NDA was the result of a rigorous and lengthy clinical and regulatory process.  FDA played an active role in outlining the required clinical program for Envarsus XR, which was based on FDA's recognition of the marked differences between Envarsus XR and other tacrolimus products, including Prograf and Astagraf XL.

45.     Veloxis began clinical investigations of prototype formulations of Envarsus XR in Europe in November 2004.  On December 20, 2006, Veloxis submitted an Investigational New Drug ("IND") application to conduct the first U.S. clinical trials in humans.

46.     During the course of the Envarsus XR clinical program, Veloxis met with FDA repeatedly to discuss the results of its trials and to explore what FDA would require to establish the safety and effectiveness of Envarsus XR.  Throughout this dialogue, Veloxis repeatedly informed FDA that it would seek approval of Envarsus XR under Section 505(b)(2), and would

base the NDA on Prograf as the only listed drug.  FDA staff repeatedly confirmed that both aspects were acceptable.

47.     Veloxis specifically designed its pivotal Phase III clinical trial based upon the rigorous requirements identified by FDA, pursuant to a procedure known as a Special Protocol Assessment ("SPA").  On March 31, 2010, Veloxis submitted its proposed Phase III trial to FDA through an SPA.  FDA reviewed the design of the proposed Phase III trial and, on August 5, 2010, FDA and Veloxis reached agreement on the SPA.  This agreement reflected FDA's conclusion that the design and planned analysis of Veloxis's proposed study adequately addressed the objectives necessary to support drug approval, assuming that the study outcomes were satisfactory.  The SPA was the result of more than four years of ongoing dialogue with FDA regarding what the Agency would require in order to approve Envarsus XR for marketing. At the time Veloxis and FDA agreed upon the testing protocol for Envarsus XR, Astagraf XL had not been approved by FDA for marketing in the United States.

48.     Veloxis was committed to the development of an effective extended-release form of tacrolimus that would improve upon Prograf, and agreed with FDA to forge ahead with an innovative clinical study of Envarsus XR.  In so doing, Veloxis undertook significant risk that the clinical study would fail.  To successfully complete its pivotal Phase III trial, Veloxis invested more than three years and in excess of $50 million in research costs.

49.     Veloxis's Phase III trial of Envarsus XR proved successful.

50.     On December 20, 2013, FDA designated Envarsus XR as an "orphan drug" pursuant to the Orphan Drug Act, Pub. L. No. 97-414 (Jan. 4, 1983).  An orphan drug is one that is intended to treat a condition affecting fewer than 200,000 people in the United States.  21

U.S.C. § 360(bb).  A drug may be eligible for orphan drug status if, among other things, it has the potential to be "clinically superior" to existing drugs marketed to treat the same disease.

51.     The Orphan Drug Act is designed to incentivize companies to develop drug products for rare diseases or conditions that affect small numbers of patients.  Products designated as orphan drugs qualify for various development incentives, including tax credits for qualified clinical testing, and may be entitled to seven years of marketing exclusivity upon approval.

52.     Because there were other tacrolimus products on the market for the same indication, FDA could only have designated Envarsus XR as an orphan drug based upon a plausible hypothesis that Envarsus XR was clinically superior to those other marketed products. 21 C.F.R. § 316.20(b)(5).  Unlike Envarsus XR, Astagraf XL was not designated individually as an orphan drug.

53.     On December 28, 2013, Veloxis submitted an NDA for Envarsus XR pursuant to Section 505(b)(2) of the FDCA. The NDA identified and relied upon a single listed drug, Prograf, for the limited purpose of making use of pharmacology, clinical pharmacokinetic (*e.g.*, tacrolimus drug interaction studies), and preclinical animal toxicology data from studies conducted on Prograf.  Veloxis relied upon no other listed drug in its NDA for Envarsus XR.

54.     In order to establish the safety and effectiveness of its novel product, the Envarsus XR NDA relied on extensive clinical trials conducted by Veloxis on Envarsus XR and the earlier-in-time pharmacology, toxicology, and pharmacokinetic data from studies conducted on Prograf.

55.     The Envarsus XR NDA *did not* reference Astagraf XL as a listed drug, *did not* rely on any studies conducted to support the Astagraf XL NDA, and *did not* rely on FDA's prior

findings of safety and effectiveness for Astagraf XL.  Accordingly, there is no statutory basis upon which to block the final approval of Envarsus XR based upon exclusivity granted to Astagraf XL.

56.     On October 27, 2014, only three days prior to the October 30, 2014 PDUFA deadline, FDA for the first time informed Veloxis that Astagraf XL's three-year exclusivity might act as a bar to the final approval of the Envarsus XR NDA.  FDA sent Veloxis an email noting that Astagraf XL had been granted three-year "new dosage form" exclusivity covering "the conditions of approval for the studies Astellas performed which were essential to the approval of Astagraf XL."  FDA asked Veloxis "whether or not you believe that the scope of Astagraf XL's exclusivity does not affect the type of action letter FDA can issue for Envarsus XR."

57.     Veloxis had no reason to believe that Astagraf XL's exclusivity would block final approval of Envarsus XR.  To the contrary, FDA publicly identified the scope of the Astagraf XL exclusivity as covering its "new dosage form," which is an extended-release *capsule*.  Envarsus XR, in contrast, is an extended-release *tablet*.  Under longstanding FDA precedent, these are unquestionably different dosage forms.  Accordingly, the exclusivity protecting Astagraf XL's "new dosage form" does not block approval of a product like Envarsus XR with a different (and also new) dosage form.

58.     Veloxis responded to FDA's inquiry via email on October 28 and followed with a submission to its NDA on October 29, 2014.  In its response, Veloxis made clear that the Envarsus XR NDA did not reference Astagraf XL or rely on any Astagraf XL clinical studies, taking it outside the purview of the Hatch-Waxman Amendments.  Veloxis also explained that

Envarsus XR and Astagraf XL are substantially different products that do not share the same "conditions of approval."

59.     On October 30, 2014, FDA took final agency action on the Envarsus NDA when it issued a Tentative Approval letter to Veloxis.  The letter explained that FDA had found Envarsus XR to be eligible for approval under the FDCA, reflecting a conclusion that Envarsus XR is safe and effective for its intended use.  Nevertheless, the Tentative Approval letter stated that FDA was delaying final marketing approval of Envarsus XR until the expiration of Astagraf XL's statutory exclusivity period because the drugs purportedly share the same "conditions of approval."  Despite repeated requests by Veloxis, FDA has never explained what "conditions of approval" it believes the two products share.

## Veloxis's Efforts to Avoid Litigation Over the Exclusivity Issue

60.     Upon receiving FDA's Tentative Approval letter, counsel for Veloxis contacted FDA's Office of the Chief Counsel to request a meeting with FDA in an effort to resolve the matter without resort to litigation.

61.     On November 6, 2014, Veloxis met with FDA personnel from interested offices and divisions.  Veloxis attendees included company personnel, a representative of the National Kidney Foundation, Dr. Roy Bloom, a leading kidney transplant physician, and outside counsel for Veloxis.  FDA attendees included personnel from the FDA Office of the Chief Counsel, as well as personnel from the review division responsible for reviewing the Envarsus XR NDA and the committee tasked with making decisions regarding exclusivity for 505(b)(2) products.

62.     At the November 6 meeting, Veloxis presented evidence (drawn from the Envarsus XR NDA) that Envarsus XR and Astagraf XL do not share conditions of approval due to their differing dosage forms, differing dosage strengths, differing dosing regimens, and different pharmacokinetic profiles.  Veloxis and Dr. Bloom explained the clinical significance of

16

these differences, as well as the potential benefits that these differences may have for patient care.  Veloxis also reminded FDA that the Envarsus XR NDA did not reference Astagraf XL as a listed drug or rely upon any Astagraf XL data or FDA's findings of safety and effectiveness with respect to Astagraf XL.  Veloxis informed FDA that it had not identified any precedent in which FDA had applied the type of exclusivity granted to Astagraf XL in such circumstances.  To the contrary, Veloxis identified for FDA prior precedent in which drugs were approved during a period of exclusivity granted to another drug with a common indication and active ingredient.

63.   During the November 6 meeting, FDA again did not articulate the conditions of approval purportedly "shared" between Envarsus XR and Astagraf XL.

64.   On November 10, 2014, FDA requested that Veloxis submit the written materials (a slide presentation) presented at the meeting, written materials describing the additional information presented orally at the meeting, and any additional data, information, or analysis regarding the implications of Astagraf XL's three-year exclusivity on the final approval of the Envarsus XR NDA.  FDA specifically requested that Veloxis identify its submission as a "Request for Final Approval."

65.   Counsel for Veloxis spoke with FDA regarding its request.  Counsel explained that although Veloxis was prepared to provide the materials requested by FDA and allow a brief period for the Agency to correct its erroneous action, thereby obviating the need for litigation, Veloxis would not countenance a material delay in initiating its legal challenge to FDA's action.  FDA assured Veloxis that it expected to be able to take action, if any, to correct or amend the Agency decision within thirty days.  In an effort to avoid litigation, Veloxis agreed.

66.   On November 14, 2014, submitted an eighteen-page letter supported by six exhibits, including a declaration by Dr. Bloom, a written statement by the National Kidney

Foundation representative who attended the meeting, and support from medical literature. Veloxis's submission served to document the information conveyed during the November 6 meeting, which in turn was drawn from the Envarsus XR NDA.

67.     Veloxis's submission addressed in detail the numerous reasons why the FDA's Tentative Approval letter was issued in error.  In particular, the submission established that Envarsus XR and Astagraf XL do not share relevant conditions of approval in light of the many significant differences between the drugs and the clinical implications of these differences.  It further addressed that applying Astagraf XL's exclusivity to block immediate final approval of Envarsus XR would be contrary to both the structure and purpose of the Hatch-Waxman Amendments as well as inconsistent with more than twenty years of FDA practice and policy.

68.     Veloxis provided additional legal arguments to FDA via submissions on December 2 and December 12, 2014.

69.     On December 5, 2014, FDA advised that if Veloxis amended its package insert to limit Envarsus XR's use solely to patients being converted from Prograf, it would grant immediate final approval of the Envarsus NDA.

70.     On December 8, 2014, Veloxis declined to revise its NDA, noting that the suggested amendment would artificially limit the patient population that would benefit from Envarsus XR and would be inconsistent with the requirements of the FDCA.

71.     On December 12, 2014, FDA notified Veloxis that it did not intend to correct or amend its Tentative Approval letter within the time period expressly agreed to by FDA, leaving the final agency action unaltered.

**FDA's Review of the Envarsus XR NDA Was Subject to
Irregularities Including Improper Non-Public Communications with Astellas**

72.     Although FDA contacted Veloxis regarding the exclusivity issue only three days

before the PDUFA deadline, FDA had been communicating with Astellas through non-public

communications for several months.  Veloxis only discovered these communications when it was

provided with certain documents pursuant to a Freedom of Information Act ("FOIA") request.

These documents suggest that FDA's Tentative Approval letter delaying the final approval of

Envarsus XR resulted from improper Agency procedure and non-public communications with

Astellas, which, as the maker of Prograf and Astagraf XL, has a monopoly on extended release

tacrolimus and would face competition for both of its tacrolimus drugs from Envarsus XR.

73.     On September 12, 2014, Astellas made a submission to its NDA, as a "follow up

to a discussion" that Astellas's Head of Global Regulatory Affairs apparently had with Dr.

Renata Albrecht, Director of the FDA review division responsible for reviewing and approving

the Envarsus XR NDA, at the World Transplant Congress in August 2014.  Although FDA had

specified the scope of Astagraf XL's exclusivity as protecting its "new dosage form" as early as

August 2013, more than a year later, in September 2014, Astellas asked FDA for a "detailed

understanding of what the granting of exclusivity means to Astellas and the types of products

which could/could not be granted approval until the exclusivity period expires."  Astellas argued

that its exclusivity "encompass[es] the once daily formulation of tacrolimus indicated for the

prophylaxis of organ rejection in transplant patients regardless of patient setting, and no

application for those conditions can be approved until the expiration of the exclusivity period on

July 19, 2016."  Astellas asked FDA whether it agreed with Astellas's view of the scope of the

Astagraf XL exclusivity.

74.     FDA's consideration of Astellas's non-public letter was contrary to Section 505(q)(1)(A) of the FDCA, which states that FDA may not delay approval of a pending 505(b)(2) application because of any request to take action (such as a request to apply another product's three-year exclusivity) unless, *inter alia*, the request is made as a publicly filed "citizen petition." 21 U.S.C. § 355(q)(1)(A).  Based on this requirement, FDA generally will refuse to consider information submitted by a drug manufacturer to its own NDA that could delay the approval of another ANDA or 505(b)(2) application unless the information is filed publicly as a citizen petition.

75.     Here, however, FDA allowed Astellas to submit a request to delay approval of the Envarsus XR NDA via private correspondence, rather than through a citizen petition, in violation of Section 505(q)(1)(A).  In so doing, FDA violated both the letter and spirit of Section 505(q)(1)(A).  Indeed, Astellas's non-public communication resulted in the very scenario Section 505(q)(1)(A) is intended to avoid—delayed approval of the Envarsus XR NDA.

**The Non-Public History of the Astagraf XL NDA**

76.     The documents Veloxis received in response to its FOIA request also revealed the previously non-public history of the Astagraf XL NDA.  Astellas initially submitted an NDA for Astagraf XL in 2005.

77.     In 2009, Astellas withdrew its pending NDA after FDA sent an "approvable letter," setting forth the deficiencies with the Astagraf XL NDA.

78.     In 2012, Astellas resubmitted its Astagraf XL NDA.  Although Astellas filed its 2012 NDA as a separate NDA, the 2012 NDA related to the 2005 NDA, and Astellas did not complete any new studies necessary for the approval of Astagraf XL between withdrawing and resubmitting the Astagraf XL NDA.

79.     In August 2012, in connection with the resubmitted Astagraf XL NDA, Astellas argued to FDA that the drug was entitled to three-year exclusivity under Section 505(v) even though tacrolimus was a pre-repeal antibiotic because Astagraf XL's once-daily dosing constituted a new "condition of use."  FDA granted Astagraf XL three-year exclusivity when the drug was approved in July 2013.

80.     More than a year later, on October 27, 2014, Astellas submitted a letter to FDA, apparently in response to an inquiry from FDA, in which it again asserted that Astagraf XL was entitled to exclusivity under Section 505(v).  The letter failed to address the significance of the fact that the Astagraf XL NDA was originally submitted in 2005.

### FDA's Grant of Exclusivity to Astagraf XL is Contrary to Law

81.     FDA's Tentative Approval letter to Veloxis states that Astagraf XL is subject to a three-year period of marketing exclusivity under FDCA Sections 505(c)(3)(E)(iii) and 505(j)(5)(F)(iii) and that "final approval of [the Envarsus XR] application under section 505(c)(3) of the Act [21 U.S.C. § 355(c)(3)] may not be made effective until [Astagraf XL's] exclusivity period has expired."   This determination was erroneous, however, because FDA lacked legal authority to grant exclusivity to Astagraf XL in 2013.

82.     As a matter of law, Section 505(v) does not authorize exclusivity for any drug product containing a pre-repeal antibiotic that was the subject of an NDA that had been approved *or was pending* prior to October 8, 2008.  *Id.* § 355(v)(1)(B)(i).  Section 505(v) of the FDCA provides that, notwithstanding FDAMA (which provided that pre-repeal antibiotics were not entitled to exclusivity), "a sponsor of a drug that is the subject of an application" "for marketing *submitted . . . after* October 8, 2008" that contains a pre-repeal antibiotic "shall be eligible for" three-year exclusivity under, *inter alia*, Section 505(c)(3)(E)(iii).  21 U.S.C. § 355(v) (emphasis added).

21

83.     The Astagraf XL NDA was submitted in 2005 and was pending at FDA prior to October 8, 2008.  Accordingly, the Astagraf XL NDA was not entitled to three-year exclusivity, and there is no basis upon which FDA may lawfully delay approval of Envarsus XR.

### FDA's Assertion That Astagraf XL's Exclusivity Period
### Blocks Final Approval of Envarsus XR is Contrary to Law

84.     FDA is without legal authority to block final approval of Envarsus XR based upon Astagraf XL's marketing exclusivity, which covers Astagraf XL's "new dosage form."

85.     Nevertheless, FDA's Tentative Approval letter to Veloxis states that Astagraf XL is subject to a three-year period of marketing exclusivity under FDCA Sections 505(c)(3)(E)(iii) and 505(j)(5)(F)(iii) and that "final approval of [the Envarsus XR] application under section 505(c)(3) of the Act [21 U.S.C. § 355(c)(3)] may not be made effective until [Astagraf XL's] exclusivity period has expired."

86.     As a matter of law, Astagraf XL's Section 505(j)(5)(F)(iii) exclusivity cannot delay final approval of Envarsus XR because Veloxis did not submit an abbreviated new drug application under Section 505(j).  Indeed, Veloxis would not be eligible to seek approval under Section 505(j) because Envarsus XR has a different dosage form, different dosing regimen, and different pharmacokinetic properties than Astagraf XL.

87.     Astagraf XL's Section 505(c)(3)(E)(iii) exclusivity also does not apply to Envarsus XR because the Envarsus XR NDA *does not* reference Astagraf XL as a listed drug, *does not* rely on any Astagraf XL data or FDA's findings of safety and effectiveness for Astagraf XL, and because Envarsus XR *does not* share "conditions of approval" with Astagraf XL.

88.     Section 505(c)(3)(E)(iii) provides that if an NDA is approved and awarded three-year exclusivity based upon "reports of new clinical investigations (other than bioavailability studies) essential to the approval of the application and conducted or sponsored by the

applicant," FDA may not approve a pending 505(b)(2) application "for the conditions of approval" of the first drug for a period of three years if the safety and effectiveness studies "*relied upon* by the [505(b)(2) applicant] were not conducted by or for [the 505(b)(2) applicant] and if [the applicant] has not obtained a right of reference or use from the person by or for whom the investigations were conducted."  21 U.S.C. § 355(c)(3)(E)(iii) (emphasis added).

89.     FDA's implementing regulations likewise focus on reliance as a necessary precondition for exclusivity, stating that the three-year exclusivity applies where a subsequent applicant "*relies on* the information supporting the conditions of approval of an original new drug application."  21 C.F.R. § 314.108(b)(4)(iv) (emphasis added).

90.     The plain language of both the statute and the regulations is unambiguous and requires an overlap in the relied-upon studies to trigger the period of exclusivity.  In the absence of such overlap, exclusivity is inapplicable.  This principle is confirmed in more than twenty years of FDA guidance establishing that exclusivity only blocks applications that *rely upon* an innovator's data.

91.     It is uncontroverted that the Envarsus XR 505(b)(2) NDA does not rely on any studies conducted by or for Astagraf XL.  Rather, the Envarsus XR NDA relies on extensive clinical trials conducted by Veloxis as well as on safety and efficacy data from the original Prograf application.  This is reflected in the fact that the Envarsus XR NDA identifies a single listed drug: Prograf.  It also is confirmed by the significant distinctions between the Envarsus XR dosing regimen and labeling instructions for use and those associated with Astagraf XL.  The Envarsus XR dosing regimen and labeling instructions for use reflect the specific data and findings from the comprehensive, independent clinical development program for Envarsus XR.

Accordingly, under the plain language of the FDCA, Astagraf XL's Section 505(c)(3)(E)(iii) exclusivity cannot block approval of the Envarsus XR NDA.

**Envarsus XR Does Not Share the Same Conditions of Approval with Astagraf XL**

92.     Envarsus XR does not share "conditions of approval" with Astagraf XL.  To the contrary, the drugs have markedly different dosage forms, formulations, and clinical and pharmacokinetic profiles.

93.     FDA recognized the clinical differences between Envarsus XR and existing tacrolimus drugs when it granted Envarsus XR orphan status on December 20, 2013.  This granting of orphan status was based on the required plausible hypothesis that Envarsus XR may be clinically superior to currently marketed tacrolimus products, including Prograf and Astagraf XL.

94.     Although Envarsus XR and Astagraf XL are both once-daily forms of tacrolimus, they are legally and clinically different drugs, and the clinical differences may significantly impact patient treatment.

95.     First, Envarsus XR and Astagraf XL do not share dosage forms.  The statutory exclusivity granted to Astagraf XL is defined in the FDA Orange Book as pertaining to a "new dosage form."  Astagraf XL is an extended-release *capsule*.  Thus, to be blocked by Astagraf XL's exclusivity, a subsequent product must share, at a minimum, Astagraf XL's dosage form, which is an "extended-release capsule."

96.     Envarsus XR does not share this critical "condition of approval" with Astagraf XL.  To the contrary, it is an extended-release *tablet*, not an extended-release *capsule*.  FDA has repeatedly confirmed that capsules and tablets are different "dosage forms" and thus are not considered to be therapeutically equivalent or substitutable for one another.  *See, e.g.*, Letter from Janet Woodcock, Director, FDA Center for Drug Evaluation and Research to Alan H.

Kaplan, Kleinfeld, Kaplan and Becker (Dec. 1, 2000) (FDA Docket Nos. 95P-0262 and 96P-0317) (rejecting attempt to treat tablets and capsules as the same dosage form).

97.     The differences between the Astagraf XL capsule and the Envarsus XR tablet are particularly significant because Envarsus XR employs Veloxis's patented MeltDose technology, which results in Envarsus XR releasing tacrolimus into the blood slowly and uniformly over time.  Longer absorption (and increasing the lowest concentrations of tacrolimus in a patient's blood, i.e., raising the "troughs") may prevent the level of tacrolimus in a patient's blood from falling below a therapeutic level.  It also may reduce the need for a patient to take additional doses of tacrolimus in order to maintain therapeutic levels (particularly people who are rapid metabolizers, such as 85% of African-American patients).

98.     Second, Envarsus XR and Astagraf XL come in different dosage strengths. Envarsus XR is available in 0.75, 1.0, and 4.0 mg dosage strengths.  In contrast, Astagraf XL is available in 0.5, 1.0, and 5.0 mg dosage strengths.

99.     Astagraf XL's dosage strengths are the same as Prograf, the twice-daily formulation of tacrolimus.  This overlap caused medication errors to be reported in Europe, where Astagraf XL is marketed under the name Advagraf.  These medication errors have led to serious adverse events, including kidney graft rejection.  As a result, FDA requires the labeling for Astagraf XL to bear a warning regarding potential medication errors.

100.    In light of the medication errors between Prograf and Astagraf XL, in October 2009, FDA specifically requested that Veloxis develop Envarsus XR in different dosage strengths in order to help avoid medication errors.  Veloxis agreed to do so and developed Envarsus XR in 0.75, 1.0, and 4.0 mg dosage strengths.

101.     Third, Envarsus XR and Astagraf XL have different dosing regimens.   For example, the starting dosage of Envarsus XR is approximately 7% lower than for Astagraf XL (0.14 mg/kg/day versus 0.15 mg/kg/day post-transplant).   Moreover, the Envarsus XR label provides a single starting dose (0.14 mg/kg/day) for all patients beginning after transplant in combination with other immunosuppressant drugs.  The Astagraf XL label, in contrast, provides different starting doses for patients beginning therapy one day prior to transplant (0.1 mg/kg/day) and those beginning therapy after transplant in combination with other immunosuppressant drugs (0.15 or 0.20 mg/kg/day).

102.     Physicians treat kidney transplant patients by monitoring the tacrolimus levels in the patient's blood.  The target blood levels ("trough levels") included in the Envarsus XR label are different from, and simpler than, those included in the Astagraf XL label.   In addition, tacrolimus dosing is generally reduced after the initial post-transplant period once acceptable therapeutic levels of tacrolimus are achieved.  The Envarsus XR label provides for step-down treatment after 30 days while the Astagraf XL label provides for step-down only after 60 days.

103.     A fourth key difference between Envarsus XR and Astagraf XL is that Veloxis performed a clinical program of Phase I, II and III studies to establish the appropriate dosages of Envarsus XR for patients converting to the drug from twice-daily tacrolimus (Prograf or a generic version thereof).   As a result, the FDA-approved package insert for Envarsus XR contains dosing instructions for physicians converting patients from Prograf to Envarsus XR. Because kidney transplant patients generally remain on immunosuppressant drugs for the life of the transplanted kidney, or approximately 10 years, many patients are currently taking twice-daily tacrolimus.  Physicians treating these patients may wish to convert them to a once-daily tacrolimus product in hopes that a reduced dosing regimen may increase medication compliance.

In the absence of clear instructions for converting patients safely and effectively from one drug to the other, however, patients are at risk of under-dosing, which may result in organ rejection. Astagraf XL's package insert does not include any instructions regarding conversion from Prograf.

104.    Fifth, Envarsus XR and Astagraf XL have different PK profiles.  A drug's PK profile reflects the way it moves into, through and out of the body, including the time course of its absorption, distribution, metabolism, and excretion.  The differences in the PK profiles of these two drugs are significant, and the PK profile of Envarsus XR may result in better patient outcomes.

105.    At the same dose as Astagraf XL, Envarsus XR shows greater but slower absorption, and a flatter profile (i.e., less significant "peaks" and "troughs").  As a result, patients taking Envarsus XR can achieve comparable blood levels of tacrolimus using an approximately 32% lower dose of tacrolimus than if being treated with Astagraf XL.  A lower dose of tacrolimus may significantly reduce the drug's serious and sometimes debilitating side effects, which may include: kidney damage, hypertension, severe diarrhea, development of diabetes, electrolyte effects such as hyperpotassium and hypomagnesium, severe tremors, seizures, blurred vision, insomnia, headaches, and forgetfulness.  Envarsus XR's prolonged time-to-peak and absorption properties also may reduce the need for additional dosing and prevent sub-therapeutic blood levels for rapid metabolizers of tacrolimus.

106.    Indeed, the PK profiles of Envarsus XR and Astagraf XL are so different that Veloxis could not have relied upon Astagraf XL data even if it had wanted to do so, but instead would have been required to conduct its own studies of the unique Envarsus XR formulation. Moreover, a generic for one would not be suitable as a generic for the other because of the

significant distinction in the bioavailability of tacrolimus (i.e., both the rate and extent of absorption are significantly different).

107.    Despite these critical differences between Envarsus XR and Astagraf XL, the FDA arbitrarily and capriciously based its Tentative Approval letter on purported and unidentified "shared conditions of approval."

108.    In delaying final approval of Envarsus XR based upon the exclusivity granted to Astagraf XL, FDA has interpreted its authority under Section 505(c)(3)(E)(iii) of the FDCA in an arbitrary and capricious manner.

109.    For the more than 20 years since the Hatch-Waxman Amendments were implemented, FDA has consistently granted final approval to Section 505(b)(2) applications for drugs that share active ingredients and indications with drugs subject to statutory exclusivity, but which otherwise differ clinically.

110.    For example, on August 1, 2000, FDA approved an NDA for Concerta[®] (extended-release methylphenidate tablets) (NDA No. 021121).  Although other methylphenidate products were previously approved to treat Attention Deficit Hyperactivity Disorder ("ADHD"), Concerta was the first 12-hour, once-daily methylphenidate product approved to treat ADHD. Concerta was granted three-year "new product" exclusivity.  Nevertheless, on April 3, 2001, less than one year after Concerta was approved, FDA approved Metadate CD[®] (extended-release methylphenidate capsules) (NDA No. 021259).  Concerta and Metadate CD are approved to treat the same indication and both are 12-hour, once-daily extended-release formulations of the same active ingredient.  Concerta and Metadate CD also—like Envarsus XR and Astagraf XL—are approved in different dosage forms (i.e., extended-release tablets and extended-release capsules,

respectively).   As a result of this critical difference, Concerta's exclusivity did not block approval of Metadate CD.

111.   Similarly, on February 28, 2000, FDA granted final approval to Androgel® 1%, a transdermal testosterone gel indicated for replacement therapy in males for conditions associated with a deficiency or absence of endogenous testosterone ("Low T") (NDA No. 021015).   FDA also granted Androgel 1% three-year "new dosage form" exclusivity (covering 25 and 50 mg doses).   Notwithstanding the exclusivity granted to Androgel 1%, on October 31, 2002, FDA granted final approval to Testim® 1%, another transdermal testosterone gel indicated for replacement therapy of testosterone, with a starting dose of 50 mg (NDA No. 021454).   Androgel 1% and Testim 1% shared active ingredients, indications, and routes of administration.   The Testim 1% NDA, however, did not reference Androgel 1%, nor did it rely on any clinical studies performed in connection with the approval of Androgel 1%.   As a result, notwithstanding the shared conditions of approval between the drugs, Androgel 1%'s exclusivity did not block final approval of Testim 1%.

112.   Indeed, Veloxis is not aware of a single instance in which FDA has applied three-year exclusivity to block approval of a product with a different dosage form that did not reference or rely upon the drug with exclusivity.

113.   Envarsus XR should be granted immediate, final approval.   The Envarsus XR NDA meets all FDA requirements for demonstrating safety and efficacy for its intended use and there are no applicable blocking exclusivities or patents that may prevent its final approval. Immediate, unconditional approval of Envarsus XR is legally and factually mandated by the FDCA, its implementing regulations, FDA policy, and longstanding precedent.   Accordingly, the

Defendants' decision to issue Veloxis a Tentative Approval letter has no basis in the law and runs afoul of the plain language of Section 505 of the FDCA.

## COUNT I

### Violation of Administrative Procedure Act § 706(2)(C)

114.    All the allegations contained in the above paragraphs are incorporated herein as if those allegations are set forth in this Count.

115.    The Administrative Procedure Act prohibits Defendants from implementing the FDCA in a way that exceeds their statutory authority.

116.    Defendants' grant of exclusivity to Astagraf XL is contrary to the plain language of the FDCA and therefore exceeds Defendants' statutory authority.

117.    Veloxis has exhausted its administrative remedies, or, to the extent that it has not, is excused from exhausting administrative remedies because further pursuit of administrative remedies would not further the goals that exhaustion is designed to further.

118.    Veloxis has no other adequate remedy at law.

## COUNT II

### Violation of Administrative Procedure Act § 706(2)(C)

119.    All the allegations contained in the above paragraphs are incorporated herein as if those allegations are set forth in this Count.

120.    The Administrative Procedure Act prohibits Defendants from implementing the FDCA in a way that exceeds their statutory authority.

121.    Defendants' assertion that the exclusivity erroneously granted to Astagraf XL precludes immediate approval of Envarsus XR is contrary to the plain language of the FDCA and therefore exceeds Defendants' statutory authority.

122.     Veloxis has exhausted its administrative remedies, or, to the extent that it has not, is excused from exhausting administrative remedies because further pursuit of administrative remedies would not further the goals that exhaustion is designed to further.

123.     Veloxis has no other adequate remedy at law.

## COUNT III

### Violation of Administrative Procedure Act § 706(2)(A)

124.     All the allegations contained in the above paragraphs are incorporated herein as if those allegations are set forth in this Count.

125.     The Administrative Procedure Act prohibits Defendants from implementing the FDCA in a way that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

126.     Defendants' actions are arbitrary, capricious, an abuse of discretion, and contrary to law because FDA has denied Veloxis final approval to which it is entitled under Section 505 of the FDCA.

127.     Veloxis has exhausted its administrative remedies, or, to the extent that it has not, is excused from exhausting administrative remedies because further pursuit of administrative remedies would not further the goals that exhaustion is designed to further.

128.     Veloxis has no other adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Veloxis prays that this Court:

129.     Declare pursuant to 28 U.S.C. § 2201 that Astagraf XL is not entitled to statutory exclusivity; that the Astagraf XL NDA does not block the immediate approval of Envarsus XR; that Defendants' failure to immediately approve the Envarsus XR NDA exceeds Defendants'

statutory authority and is arbitrary, capricious, and contrary to law; and that the Envarsus XR NDA is entitled to immediate, final approval.

130.    Enter preliminary and permanent mandatory injunctions ordering FDA to rescind the marketing exclusivity awarded to Astagraf XL and ordering FDA to grant immediate, final approval of the Envarsus XR NDA.

131.    Award Veloxis reasonable attorneys' fees and costs for pursuing this action pursuant to 28 U.S.C. § 2412; and

132.    Provide such other and further relief as the Court deems just and proper.


Dated:  December 16, 2014                    Respectfully submitted,
                                             /s/ Mitchell S. Ettinger

                                             Jennifer L. Bragg (D.C. Bar No. 488946)
                                             Mitchell S. Ettinger (D.C. Bar No. 415451)
                                             Lauryn K. Fraas (D.C. Bar No. 984887)
                                             Colin V. Ram (D.C. Bar No. 989848) *admission
                                                and pro hac vice application pending*
                                             SKADDEN, ARPS, SLATE, MEAGHER
                                                & FLOM LLP
                                             1440 New York Avenue, N.W.
                                             Washington, DC 20005
                                             (202) 371-7000 (tel.)
                                             (202) 393-5760 (fax)

                                             Maya P. Florence (D.C. Bar No. 986139)
                                             SKADDEN, ARPS, SLATE, MEAGHER
                                                & FLOM LLP
                                             500 Boylston Street
                                             Boston, MA 02116
                                             (617) 573-4800 (tel.)
                                             (617) 573-4822 (fax)

                                             *Attorneys for Plaintiff Veloxis Pharmaceuticals, Inc.*